**BURDETT SOUND, INC.,**
**Plaintiff-Appellant,**

v.

**ALTEC CORPORATION et al.,**
**Defendants-Appellees.**

No. 74–2708.

United States Court of Appeals,
Fifth Circuit.

July 21, 1975.

John Walton Henderson, Jr., Atlanta, Ga., H. Lee Moffitt, Tampa, Fla., for plaintiff-appellant.

Ted R. Manry, III, John A. Curtiss, Thomas B. Mimms, Jr., Tampa, Fla., for defendants-appellees.

Before COLEMAN, MORGAN and CLARK, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This case presents the none too novel question of whether a manufacturer violates the Sherman Act when it terminates a business relationship with one of its distributors and contracts with a new firm. Finding that it does not, we affirm the judgment below.

### I.

Altec Corporation is a manufacturer of sound and communications equipment for use in commercial establishments. Burdett Sound was an authorized sound engineering contractor for Altec in Tampa, Florida, and thirteen west coast Florida counties. Although it was the only factory authorized Altec representative for those counties, its representation was on a non-exclusive basis. Hence, its bids for contracts were from time to time challenged by bids from Altec's contractors in Jacksonville and Orlando. Likewise, it was not prevented from bidding on jobs outside its territory, nor was it precluded, by its contract with Altec, from representing competing brands.

Burdett Sound had been an authorized Altec representative under written contract since 1954. The last contract between the parties, dated November 21, 1967, provided that Burdett Sound would pay all invoices within 30 days, that it would purchase a minimum of $20,000 during each six-month period and that failure to meet either of these conditions

would permit Altec to terminate the contract. The agreement also provided that it would remain in force for one year, that renewal could be accomplished only by notice from Altec, and that renewal could be terminated by either party giving ten days written notice.

The parties stipulated that indebtedness of Burdett Sound to Altec averaged $127,000 for the year of 1968. As of November 21, 1968, in fact, Burdett Sound was indebted to Altec in the amount of more than $30,000 and approximately $23,000 of the indebtedness was more than 30 days old.

, Throughout the entire business relationship of the parties, Altec was troubled by Burdett Sound's tardy payments, a condition that became particularly acute in 1968. Rather than immediately cancelling the agreement, Altec agreed to the assignment of payment from Burdett Sound of certain specific sound system jobs. Altec also imposed a hold on Burdett Sound's orders for new equipment.

In 1968, Allen Burdett, president of Burdett Sound, had discussions with Carl Colip, president of Commercial Electronics, Inc., among others, concerning the latter's possible acquisition of Burdett Sound. Colip considered establishing a Florida subsidiary or purchasing Burdett Sound and operating it as a subsidiary. Proposed articles of incorporation were even prepared for this purpose, but were never filed.

Colip also had discussions with Altec in order to ascertain the exact indebtedness of Burdett Sound and to insure that he would be granted an Altec franchise if he made the purchase. During the negotiations, Commercial Electronics shipped Burdett Sound equipment in order to help it complete jobs during the period in which Altec placed a credit hold on its accounts.

Burdett Sound alleges that Altec imposed the credit hold in order to force it to sell the business to Colip. Altec maintains that it imposed the credit hold because it was being pressured by other distributors, none of which was receiving $27,000 of interest-free long term financing.

At any rate, Altec admits that it had an interest in Burdett's negotiations with Colip, that it supplied Colip with Burdett Sound's financial records and customer lists in order to apprise him of the latter's financial condition, that it communicated with Colip during the negotiations, and that it generally encouraged Burdett Sound to sell out.

Nevertheless, Burdett Sound refused to sell its assets to Commercial Electronics and the negotiations were discontinued. On February 4, 1969, Altec terminated its written agreement with Burdett Sound.[1] Thereafter, Altec contacted Colip and offered him the franchise, but he could never bring a distributorship into operation. Altec then entered into a distributorship agreement with another corporation, Signal Systems Division of Electric Machinery Services, Inc., on August 22, 1969.

Buoyed by visions of treble damages, Burdett Sound filed suit in district court, alleging a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1973). The complaint avers a conspiracy between Altec and Commercial Electronics to drive Burdett Sound out of business. On April 30, 1974, the district court dismissed the case against Commercial Electronics, finding that it had not transacted business within the court's jurisdiction. On May 13, 1974, the district court followed a long line of antitrust cases and granted Altec's motion for summary judgment. Burdett Sound appeals both orders. Because we find that Burdett's claims fail to establish an antitrust violation by either appellee, we do not address the jurisdictional aspects of the case.

II.

The facts in Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972) are virtually

---

1. In its letter of termination Altec indicated that Burdett Sound had not met the minimum purchase requirements and therefore Altec terminated the agreement.

identical to those before us. In *Bushie,* the plaintiff, formerly a distributor for defendant's manufacturing corporation brought suit under Sherman §§ 1 and 2 when the defendant cancelled his distributorship contract and retained a new distributor. The Ninth Circuit affirmed summary judgment in defendant's favor. In finding that the plaintiff did not present a § 1 claim, the court conceded that the agreement between the manufacturer and the new distributor would eliminate the plaintiff as a distributor, but the court held that this effect would not support a conclusion that the manufacturer's motive was anti-competitive. Hence, the court ruled that a manufacturer may discontinue dealing with a particular distributor for business reasons sufficient only to itself, and adverse effects upon the distributor are immaterial absent any arrangement restraining trade. *Id.* at 119–120. In regard to the § 2 claim, the court held that unless the manufacturer used the control over his own products to establish market dominance, the antitrust laws are not violated. *Id.* at 120–121.

Burdett Sound apparently concedes that a substitution of distributors presents no violation of the antitrust laws. However, appellant claims that Altec committed various unfair trade practices which distinguish this case from other distributor substitution cases, to wit: Altec furnished Commercial Electronics with a file of Burdett Sound's previous bids; Altec terminated the contract agreement erroneously relying upon appellant's failure to meet purchase requirements; Altec participated in discussions with Carl Colip while he was negotiating with Burdett Sound; Altec advised Burdett Sound to sell its business to Colip; Altec terminated Burdett Sound's contract and reissued it to Colip.

■ In support of its argument, appellant cites numerous cases involving price-fixing, group boycotts or attempts to drive another competitor out of business, none of which are applicable here. Even if we assume appellant's factual

assertions to be true, *see* Fed.Rule Civ.P. 56(c), it has not presented an antitrust claim.

■ It is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166. A refusal to deal becomes illegal under the Sherman Act only when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of monopoly. United States v. Parke, Davis & Co., 362 U.S. 29, 32, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963). A mere unilateral change of distributors is not an unusual business practice, nor is it a violation of the antitrust laws. Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918, 921 (9th Cir. 1968), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654; Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283, 286 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166.

Most favorably viewed, the facts which appellant alleges tend to show only an agreement between Altec and Commercial Electronics. Appellant alleges no horizontal conspiracy among competitors, no effort by either appellee to establish market dominance, no restrictive trade practices, and no anti-competitive intent or effect.

We think it indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B. All of the cases [cited earlier in the opinion] stand for this rule. The rule is also expressly recognized in cases upon which appellee relies, and which we have discussed. There is language in many of those cases which, taken out of context, plaintiff construes as

meaning that, if the seller agrees with a third party—a competitor of the seller, for example, or a competitor of A—to do the same thing, a *per se* violation of section 1 has occurred. This obviously cannot mean an agreement with B, the new distributor; he could not accept the distributorship without agreeing to do so. And the decisions cited [earlier in the opinion] make it clear that the decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A. No case cited to us, and none that we have found, actually goes so far as plaintiff claims. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71, 78 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755.

■ Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business. Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972); Ricchetti v. Meister Brau, Inc., 431 F.2d 1211 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke and Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755; Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir. 1968), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654; Ace Beer Distributors, Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir. 1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166; Kirihara v. The Bendix Corp., 306 F.Supp. 72 (D.Hawaii 1969); Potter's Photographic Applications Co., Inc. v. Ealing Corp., 292 F.Supp. 92 (E.D.N.Y.1968); E. A. Weinel Construction Co. v. Mueller Co., 289 F.Supp. 293 (E.D.Ill.1968).

In its argument to this court, Burdett Sound virtually abandoned its Section 2 claim. Suffice it to say that there is absolutely nothing in appellant's allegations which would suggest that Altec's substitution of distributors portends an acquisition of monopoly or an attempt to do so. See Bushie v. Stenocord Corp., 460 F.2d 116, 120–121 (9th Cir. 1972).

Affirmed.